IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2003 Session

## VICKIE LYNN NASH v. THOMAS STEPHEN NASH

**Appeal from the Circuit Court for Knox County**
**No. 86733     William K. Swann, Judge**

**FILED JULY 18, 2003**

**No. E2002-01597-COA-R3-CV**

This appeal of a judgment for divorce entered by the Knox County Circuit Court questions whether the Trial Court erred in its classification and division of a 401(k) retirement account and in its award of rehabilitative alimony. We affirm in part, modify in part and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Modified in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Jerrold L. Becker, Knoxville, Tennessee, for the Appellant, Thomas Stephen Nash

John D. Lockridge, Knoxville, Tennessee, for the Appellee, Vickie Lynn Nash

### OPINION

The Appellant, Thomas Stephen Nash, and the Appellee, Vickie Lynn Nash, were re-married in June of 1997 after a prior divorce. However, this marriage also failed and, after a trial on March 6, 2002, the parties were granted a divorce on the grounds of irreconcilable differences by judgment entered June 18, 2002. Among other things the judgment provides as follows:

> 5. **RETIREMENT**: The wife shall receive her 401(k) entitlement in its entirety, and one-third of the appreciation in the husband's 401(k) that accrued during the time of the marriage. The wife shall receive the sum of $23,226.20 from the husband's 401(k). The Husband shall execute all documents necessary to effectuate this transfer.
>
> ...

8. **ALIMONY**:  The [husband] will pay the [wife] rehabilitative alimony in the amount of $400.00 per month for forty-eight months, beginning April 1, 2002, and payable each month thereafter.

Subsequent to the entry of this final judgment Mr. Nash filed timely notice of appeal.

The issues addressed in this opinion are restated as follows:

1. Did the Trial Court improperly classify a portion of Mr. Nash's 401(k) account as marital property?

2.  Did the Trial Court err in awarding Ms. Nash any portion of Mr. Nash's 401(k) account?

3.  Did the Trial Court err in awarding Ms. Nash rehabilitative alimony?

Our standard of review in this non-jury case is *de novo* upon the record of the proceedings below and there is no presumption of correctness with respect to the Trial Court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 and T.R.A.P. 13(d).  The Trial Court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary.  *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993).

The first issue we address is whether the Trial Court improperly classified a portion of Mr. Nash's 401(k) account as marital property.

On June 30, 1997, two days after the parties' second marriage, Mr. Nash, who was employed with Ameristeel, had contributed to a 401(k) account which was then valued at $55,802.27.  On March 4, 2002, two days before the divorce hearing, this 401(k) was valued at $125,480.88.  The record shows that the monies in Mr. Nash's 401(k) were held as shares of Fidelity Puritan Fund and Fidelity Magellan Fund mutual funds. That portion of the 401(k) account consisting of shares of the Fidelity Puritan Fund was valued at $31,655.90 on June 30, 1997, and at  $80,972.36 on March 4, 2002, while that portion of the account consisting of shares of the Fidelity Magellan Fund was valued at $24,146.37 on the former date and at $44,508.52 on the latter date.  Although the value of both funds increased during the period of the parties' marriage, Mr. Nash contends that all contributions made during that time were applied only to the Fidelity Magellan Fund, that no contributions were applied to the Fidelity Puritan Fund  and that the increased value of the Fidelity Puritan Fund resulted exclusively from market performance.

Based upon the value of Mr. Nash's 401(k) account on June 30, 1997, and its value on March 4, 2002, the Trial Court found that during the course of the parties' marriage the value of the 401(k)

was enhanced by $69,678.61[1] and, as noted, awarded one third of this amount, or $23,226.20, to Ms. Nash. Mr. Nash argues that the Court erred in classifying this $69,678.61 as marital property, asserting that the funds allocated to the Fidelity Puritan Fund were not increased by contributions during the parties' re-marriage and that all enhancement in the value of that fund during the marriage was due to market performance. Accordingly, Mr. Nash maintains that the amount by which the Fidelity Puritan Fund increased during the marriage should be classified as his separate property, rather than marital property.

In its memorandum opinion the Trial Court stated its finding that "[t]he husband's enhancement to his 401(k) has occurred because of his annual contributions and by the operation of marketing forces for which neither party can take credit." The Trial Court does not appear to have made any finding as to how the contributions made during the parties' marriage were allocated between the Fidelity Puritan Fund and the Fidelity Magellan Fund. Although Mr. Nash asserts that the appreciation of the Fidelity Puritan Fund was entirely the result of market performance, our review of the record does not disclose evidence supporting that assertion. While Mr. Nash testified that, during the period of the parties' marriage, the appreciation of the 401(k) account was due to allowed contributions and market conditions, we find nothing in his testimony which indicates that the appreciation in value of the Fidelity Puritan Fund was wholly attributable to market performance and that no contributions made to the 401(k) account during the marriage were allocated to that fund. Statements from Mr. Nash's employer, Ameristeel, show that from April 1, 1997, to June 30, 1997, and from January 1, 2002, until March 4, 2002, all contributions to the 401(k) were allocated to the Magellan Fund and, because no contributions were made to the Fidelity Puritan Fund, we must necessarily conclude that any enhancement in the value of the Fidelity Puritan Fund during these periods of time is attributable to market performance alone. Of course, the period of time before June 30, 1997, preceded the parties' marriage and the increase in the account which occurred then does not constitute marital property and is not at issue. Other than the statement showing the allocation of contributions to the 401(k) account from January 1, 2002, until March 4, 2002, there is no proof in the record as to the amount of contributions made to the 401(k) or as to how contributions to the account were allocated during the parties' marriage. Given this lack of evidence, we cannot say that contributions were not made to both the Fidelity Magellan Fund and the Fidelity Puritan Fund during the period of the parties' marriage.

Mr. Nash cites the case of *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002) wherein the Supreme Court held that the appreciation of a husband's separate investment accounts remains separate property when the appreciation is entirely market driven and the other spouse does not substantially contribute to the preservation and appreciation of the accounts. As stated, we do not find evidence that the appreciation of the Fidelity Puritan Fund was entirely market driven in the case before us. We also note that the husband's investment accounts in *Langschmidt* consisted, in

---

[1]Although the Trial Court states in its memorandum opinion that the enhanced value of the account was "some $70,000.00 over the course of the marriage" it is evident from the stated value of the account on June 30, 1997, and on March 4, 2002, that the specific amount of enhancement was $69,678.60 and that the Trial Court calculated its award of $23,226.20 to Ms. Nash based upon this amount.

part, of individual retirement accounts. T.C.A. 36-4-121(b)(1)(B) provides for the inclusion of the value of retirement benefits during the marriage as marital property as follows:

> (B) *'Marital property' includes* income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and *the value of* vested and unvested pension, vested and unvested stock option rights, *retirement* or other fringe benefit *rights* relating to employment *that accrued during the period of marriage*. (Emphasis added.)

The *Langschmidt* Court determined that, because the husband's individual retirement accounts were funded with premarital assets, the accounts were not retirement benefits and, therefore, were not marital property under T.C.A. 36-4-121(b)(1)(B). In reaching this determination the Court cited, at page 749, the following language from its previous holding in *Cohen v. Cohen*, 937 S.W.2d 823, (Tenn. 1996):

> [t]o the extent earned during the marriage, the benefits represent compensation for marital effort and are substitutes for current earnings which would have increased the marital standard of living or would have been converted into other assets divisible at dissolution ....
>
> [R]etirement benefits have been described as part of the consideration earned by an employee, [] and as a form of deferred compensation provided by the employer for work already performed.

The individual retirement accounts in *Langschmidt* did not qualify as retirement benefits under the *Cohen* analysis. However, the proof in the instant matter does not warrant a finding that the Fidelity Puritan Fund was funded solely with premarital assets in contrast to the accounts in *Langschmidt*. It is possible that contributions were made to the Fidelity Puritan Fund during the parties' marriage. If so, such contributions represent "deferred compensation" "which would have increased the marital standard of living or would have been converted into other assets divisible at dissolution" and would constitute marital property under T.C.A. 36-4-121(b)(1)(B). Accordingly, we cannot say that the evidence preponderates against the Trial Court's classification of the appreciation of the fund during the parties' re-marriage as marital property.

At the trial of this case Ms. Nash sought one-half of the approximately $70,000.00 by which Mr. Nash's 401(k) account had increased during the marital period. As noted, the Court awarded Ms. Nash one third of this increased value. Ms. Nash states in her brief that the Court did not err in awarding her one third of the account and states that "the [C]ourt specifically applied the principals of equitable distribution by awarding [Mr. Nash] the lion['s] share of said account." Mr. Nash disagrees and argues that the Trial Court erred in awarding *any* portion of his 401(k) account to Ms. Nash based upon proper application of those factors set out as follows at T.C.A. 36-4-121(c):

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

As to the first factor, it appears that the parties' marriage was of short duration as stated at trial by Ms. Nash's attorney. The parties were married approximately four years and nine months. They were separated for a portion of the marriage, although they are not in agreement as to whether they separated in June of 2000, as asserted by Ms. Nash, or in May of 1999, as asserted by Mr. Nash. The Trial Court was unable to make a finding as to precisely when the parties separated nor are we. Suffice it to say that the parties were separated for at least twenty one months or, at most, thirty four months, of the period of their marriage.

As to the second factor, at the time of the divorce both Mr. and Ms. Nash were forty six years of age and, apparently neither party had health problems. We find no evidence regarding the parties' vocational skills. Both parties were employed at the time of the divorce.

Ms. Nash earns $13.00 per hour, or approximately $29,000.00 per year, as an administrative assistant with Pilot Oil Company where she has been employed since March of 1998. Ms. Nash testifies that, because she was able to work overtime, she earned $30,493.37 in 1999 and $35,137.43 in 2000 and in 2001 she earned $51,828.12 because she was able to work additional shifts as a result of her employer's merger with another company. However, Ms. Nash maintains that she was present at a senior officers mangers meeting and was told that she would not receive more than her base

salary of $29,000.00 during the year of trial below. Ms. Nash's affidavit of income and expenses shows that her monthly net income amounts to $1,375.00 (presumably based upon her salary of $29,000 per year) and her monthly expenses total $1,807.00 resulting in a monthly deficit of $432.00. Ms. Nash testifies that in the past she has supplemented her income by cleaning houses for which she has earned $200.00 per month; however, this supplemental employment is sporadic and she testifies that she did not clean houses in 1999, 2001 or 2002. Ms. Nash also testifies that, as of the time of the divorce, she had applied for a second job at a hardware store.

Mr. Nash earns a base salary of $52,500.00 per year from his employment with Ameristeel, and he earned an additional $30,000.00 in 2001, apparently as a result of bonuses he was awarded. Mr. Nash's affidavit of income and expenses shows that his net monthly income amounts to $4,882.75 and that his monthly expenses total $3,547.57 resulting in a monthly gain of $1,335.18.

No evidence was presented as to factor number three.

As to factor number four, Mr. Nash concedes that he "probably has a greater ability for acquiring capital assets and income."

With respect to factor number five, we note that the contributions to Mr. Nash's 401(k) account came solely from his income. However, Ms. Nash contributed to the marriage as a homemaker by cooking, cleaning and caring for the parties' son who was fourteen at the time of their marriage. For the first nine months of the marriage Ms. Nash performed these duties alone and maintained the household while Mr. Nash was out of town on business. Once she began working the parties shared the household responsibilities. Ms. Nash testified that prior to the time of the parties' separation she used the income from her job to pay for groceries, utilities and to purchase clothing for herself and gasoline for her car. She also testified that she used her earnings to refurbish the house. Although she did not contribute directly to Mr. Nash's 401(k) account, the monies she expended for the items noted necessarily left more of Mr. Nash's income available for contributions to such account.

As to factor number six, Mr. Nash concedes that he has a greater separate estate than Ms. Nash.

Regarding factor number seven, it appears from the evidence that, at the time of the marriage, Mr. Nash held, as previously noted, $55,000.00 in his 401(k) account and that he owned the house in which the parties lived, it having been awarded to him in their previous divorce.

With respect to factor number eight, there was significant disparity between the economic circumstances of Mr. and Ms. Nash at the time of division of property, as evidenced by their affidavits of monthly income and expenses as already noted above.

We find no evidence in the record as to factors nine and ten.

Mr. Nash cites *Batson v. Batson*, 769 S.W.2d 849 (Tenn. Ct. App. 1988) for the proposition that "[i]n cases involving a marriage of relatively short duration, it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place." Mr. Nash asserts that Ms. Nash's economic condition actually improved after her June 1997 marriage because of her discharge of $65,000.00 in debt through bankruptcy in 1997 and because, although she was unemployed at the time of her marriage, she found employment with Pilot Corporation in March of 1998 at a salary of $24,800.00 per year and, at the time of trial earned $29,000.00. However, we are compelled to note that, according to Ms. Nash's unrefuted testimony, she filed for bankruptcy in May of 1997 which was prior to her marriage and there is no reason to believe that her debts would not have been discharged had the marriage never taken place. We also note the following testimony of Ms. Nash which shows that she was earning substantially more money in the job she left just prior to her marriage to Mr. Nash:

Q  In June of '97 shortly prior to your marriage, where were you residing?

A  In Nashville.

Q  Why Nashville?

A  That's where I had employment.

Q  Were you employed at the time you all got remarried?

A  I have a two-week notice prior to returning to Knoxville.

Q  And by whom were you employed there?

A  Bryers Health Care.

Q  Approximately how much were you earning there?

A  42,000.

Neither her discharge of past debt in 1997 nor the fact of her employment with Pilot Corporation belie the fact that Ms. Nash is currently economically disadvantaged. Her affidavit of monthly expenses reveals no extravagances and Mr. Nash presents no basis for concluding that such expenses were other than reasonable.

Mr. Nash also cites *Batson, ibid.* for the proposition that "when a marriage is short, the significance and value of a spouse's non-monetary contributions is diminished, and claims by one spouse to another spouse's separate property are minimal at best." We have considered the brevity of the marriage as well as the period of separation, as did the Trial Court. We find that the Trial

Court award is sufficiently discounted under the circumstances in that Ms. Nash was awarded one third, rather than one half, of the increased value of Mr. Nash's 401(k) account.

A trial court is allowed wide discretion as to the manner in which it divides marital property. *Smith v. Smith*, 984 S.W.2d 606 (Tenn. Ct. App. 1997). Our analysis of this case in the context of those statutory factors set forth at T.C.A. 36-4-121(c) convinces us that the Trial Court did not abuse its discretion in awarding Ms. Nash one third of the enhanced value of Mr. Nash's 401(k) account.

The final issue we address is whether the Trial Court erred in awarding Ms. Nash rehabilitative alimony in the amount of $400.00 per month for forty eight months.

Just as a trial court is allowed a large amount of discretion in its division of marital property, it is also allowed a large amount of discretion in determining a proper award of alimony. *Hanover v. Hanover*, 775 S.W.2d 612 (Tenn. Ct. App. 1989). Factors which a trial court should consider in determining the proper form and amount of spousal support are set forth at T.C.A. 36-5-101(d)(1) as follows:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
(C) The duration of the marriage;
(D) The age and mental condition of each party;
(E) The physical condition of each party; including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
(G) The separate assets of each party, both real and personal, tangible and intangible;
(H) The provisions made with regard to the marital property as defined in § 36-4-121;
(I) The standard of living of the parties established during the marriage;
(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Obviously, there is substantial overlap between these statutory factors and those factors set forth at T.C.A. 36-4-121(c) relative to the proper division of marital property. Accordingly, several of these factors have already been discussed relative to the circumstances present in this case.

With respect to factor (A), as previously noted, the record indicates that Mr. Nash's earning capacity far exceeds that of Ms. Nash. Mr. Nash's earnings in the year prior to the divorce totaled approximately $80,000.00, consisting of his base salary of $52,500.00 plus the amount of his bonus for that year. Ms. Nash earns a base salary of $29,000.00. Although she has been able to earn additional monies in the past, primarily by working overtime, Ms. Nash testified that, at least in the year of her divorce, she had reason to believe that she would not be earning more than her base salary in her job at Pilot Corporation. While Mr. Nash argues that Ms. Nash has the capacity to earn greater income by taking a second job, he presents no evidence as to what jobs she might be qualified to perform, the availability of such jobs or how much such jobs would pay. As to the obligations, needs and financial resources of each party, we have already observed that, based upon the information set forth in their affidavits of income and expenses, Mr. Nash realizes a net gain each month of $1,335.18 while Ms. Nash experiences a monthly deficit of $432.00.

With respect to factor (B), the parties apparently do not dispute the Trial Court's finding that each of them has two years college education. No proof was presented regarding the training of Ms. Nash or the necessity that Ms. Nash secure further education or training in order to improve her earning capacity.

Factors (C),(D) and (E) have already been discussed and factor (F) is not applicable.

As to factor (G), the record shows that Mr. Nash's separate property consists of a bedroom suite with a stipulated value of $4,800.00, the marital residence upon which he makes mortgage payments, a 1995 Suburban automobile, and the Ameristeel 401(k) account which was worth approximately $55,000.00 at the time of marriage. The separate property of Ms. Nash as shown in the record consists of household goods valued at $1,000.00, bank accounts containing approximately $1,700.00, a condominium upon which she makes mortgage payments, and a 401(k) account with her employer valued at $3,000.00 in September of 2001.

With respect to factor (H), the marital property of apparent monetary value was divided as follows. Ms. Nash received an antique table valued at $100.00, phonograph records valued at $200.00 and china, crystal and silver serving pieces of unspecified value. And, as noted, Ms. Nash received one third of the appreciated value of Mr. Nash's 401(k) account which amounted to $23,226.20. Mr. Nash received a large screen television which he purchased for $2,000.00 in 2001, and a 1995 Jeep which was purchased used in 1998 for $12,000.00 and upon which he was still making payments at the time of divorce. Mr. Nash was also, as previously noted, awarded two thirds of the amount by which the Ameristeel 401(k) account was enhanced during the marriage, which award totaled $46,452.40.

Regarding factor (I), we find no evidence as to the standard of living the parties established during the marriage.

We have already noted the parties monetary and homemaker contributions to the marriage relevant to factor (J). We find no evidence as to any contributions by either party to the education, training or increased earning power of the other.

As to factor (K), it does not appear that the fault of the parties was at issue in this case and we find no evidence in the record with regard to this factor.

Finally, with respect to factor (L), we note that the Trial Court ordered that Mr. Nash pay Ms. Nash's attorney fee related to this divorce in the amount of $2,500.00.

This Court has hitherto recognized that, although all of the factors under T.C.A. 36-5-101(d) must be considered in arriving at a decision regarding spousal support, "[i]n virtually every case, the two most important factors are the demonstrated need of the disadvantaged spouse and the obligor spouse's ability to pay." *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998).

Our analysis of this case convinces us that Ms. Nash is economically disadvantaged. As stated, her monthly expenses, which we find to be reasonable, exceed her monthly net income by $432.00. We recognize that this calculation is based upon her base income of $29,000.00 and that she has in prior years earned monies in excess of that amount. However, it appears that in order to earn this additional income she was compelled to work overtime and additional shifts and take on additional jobs in addition to the full time position she already held . Even should we find that it is reasonable that Ms. Nash go to such lengths to meet her day to day expenses, we are compelled to point out that she was only able to work the additional shifts which allowed her to earn $51,000.00 in 2001 because of a company merger and she testified that the next year she would not earn more than her base salary. We also note that, just prior to her marriage Ms. Nash was earning $42,000.00 a year in Nashville and that she gave up that job and moved to Knoxville upon her marriage to Mr. Nash. There is no question as to Mr. Nash's ability to pay. As noted, he realizes a net gain each month of $1,335.18, has greater earning capacity and the value of his assets is substantially greater.

On the other hand, we recognize that Ms. Nash was awarded $23,226.20 as her share of the increased value of Mr. Nash's 410(k) account, the entire account balance of her own 401(k) account which amounted to approximately $3,000.00 and she retains $1,700.00 in personal bank accounts. We also note that, while Ms. Nash's base salary is currently insufficient to allow her to meet her monthly expenses, her job is apparently secure and her base salary has been raised from $24,800.00 since she began her employment in March of 1998 and will presumably increase in the future. While we find that Ms. Nash is entitled to a certain amount of rehabilitative support, we believe that the amount awarded by the Trial Court is somewhat excessive, especially in light of the financial resources she has been awarded and also in light of the undisputed brevity of the marriage. Accordingly, we modify the Trial Court's order by awarding Ms. Nash rehabilitative alimony in the amount of $400.00 per month for twenty four months rather than forty eight months. We believe that, under the circumstances, this modified award, along with the other resources available to her, will be sufficient to achieve the purpose of rehabilitative alimony as described by our Supreme Court in *Robertson v. Robertson*, 76 S.W.3d 337 (Tenn. 2002) at page 340-341:

...[R]ehabilitative alimony may assist the disadvantaged spouse in obtaining further education or training. (citations omitted). "Rehabilitative alimony serves to support an economically dependent spouse 'through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." It may also provide temporary income to support the disadvantaged spouse during the post-divorce economic adjustment. (citations omitted)

For the foregoing reasons the judgment of the Trial Court is affirmed in part and modified in part as set forth herein. This case is remanded for such further proceedings, as may be necessary, and for collection of costs below. Costs of appeal are adjudged equally to Vickie Lynn Nash and to Thomas Stephen Nash and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE